Filed 5/17/23  In re E.M. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re E.M., a Person Coming Under the Juvenile Court Law. | D081357 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J519312) |
| v. | |
| K.H., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael P. Pulos, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Evangelina Woo, Deputy County Counsel, for Plaintiff and Respondent.

INTRODUCTION

K.H. (Mother) appeals from the juvenile court's order terminating her parental rights to E.M., her then seven-year-old daughter. (Welf. & Inst. Code, § 366.26.)[1] She contends the juvenile court erred in finding the beneficial parent-child relationship exception to adoption did not apply. (§ 366.26, subd. (c)(1)(B)(i).) Because we conclude Mother has not affirmatively demonstrated error, we affirm.[2]

## FACTUAL AND PROCEDURAL BACKGROUND[3]

### I.

### *Prior Dependency Proceedings*

E.M. tested positive for alcohol at the time of her premature birth in August 2015. About five months later, E.M. came to the attention of the San Diego County Health and Human Services Agency (Agency) when Mother had a car accident. Mother was arrested for driving under the influence of

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]    In addition to the order terminating her parental rights, Mother states in her notice of appeal that she also challenges the order denying her section 388 petition. But she does not state the grounds upon which she appeals this other order and does not challenge it in her briefing on appeal. To the extent Mother intended to raise additional issues by way of her notice of appeal, we deem them forfeited and do not address them. (*People v. Roscoe* (2008) 169 Cal.App.4th 829, 840 [issues not raised in the opening brief are forfeited]; see also *Berger v. Godden* (1985) 163 Cal.App.3d 1113, 1119–1120 [an appellate court is not required to "consider alleged error where the appellant merely complains of it without pertinent argument"].)

[3]    "In accord with the usual rules on appeal, we state the facts in the manner most favorable to the dependency court's order." (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1448, fn. 1.)

alcohol while E.M. and Mother's minor son[4] were in the car. E.M. was placed in a licensed foster home with C.C. (the caregiver) from March 2016 to August 2017. Jurisdiction was later terminated in August 2018, after Mother made adequate progress with services and reunified with E.M.

## II.

### *Current Dependency Proceedings*

Less than two years later, in January 2020, E.M. came to the Agency's attention again when it received reports of significant bruising on E.M.'s inner and outer thighs. Most of E.M.'s bruises were the size of a quarter while others were approximately two inches in length. A child abuse pediatrician opined the bruises were "definite inflicted injuries" that required significant force to develop.

Four-year-old E.M. told the Agency that W.G. (Father)[5] had pinched her for spilling water, that the pinching hurt, and that she cried. Meanwhile, Mother and Father provided inconsistent, implausible explanations for E.M.'s injuries. After investigating, the Agency concluded Mother had minimized Father's behavior and E.M.'s injuries, and that she was not capable of protecting E.M. from further abuse. The Agency further concluded that E.M.'s statements about "daddy hurt[ing] mommy" and reports about

---

[4] Mother's ongoing history with the Agency dates back to a voluntary services case opened in October 2015 when she was arrested for driving under the influence of prescription drugs with her minor son in the car. Mother's minor son and two adult children have a different father than E.M. and are E.M.'s half-siblings. Because E.M.'s half-siblings are not parties to this appeal, we discuss them only as needed.

[5] Because Father is not a party to this appeal, we discuss him only as needed.

Mother's own injuries and bruising indicated that E.M. was likely being exposed to domestic violence between the parents.

On January 15, 2020, the Agency filed a dependency petition on E.M.'s behalf, pursuant to section 300, subdivision (a). Three days later, E.M. moved from her maternal aunt's home to the caregiver's home where E.M. previously lived during her first dependency case. At the detention hearing, the juvenile court found the Agency made a prima facie showing on the petition, detained E.M., and ordered voluntary services and supervised visits for Mother and Father.

Mother began attending supervised visits with E.M., and the caregiver initially reported that E.M. was doing "well" with the visits and in the caregiver's home. According to the caregiver, E.M. would sometimes tell Mother she was "only here to say 'hi' " and was "living with [the caregiver] forever" and "never coming home." The caregiver also reported some concerns about E.M.'s aggression toward other small children—including biting, punching, and hitting—behaviors that E.M. had engaged in even before removal. To address these issues, the Agency referred E.M. to Comprehensive Assessment Stabilization Services (CASS) with a case manager.

In conversations with the Agency, Mother admitted that she leaned on substances to cope with her childhood trauma. She considered alcohol her "drug of choice" but stated that she also "popp[ed] pills" like Klonopin and Trazadone. She told the Agency she was using a sobriety application on her phone to hold herself accountable and that she had started domestic violence classes and counseling. She expressed concern that the caregiver was "trying to take [E.M.]" away from her.

4

In April 2020, Mother's in-person visits with E.M. were suspended because of the COVID-19 pandemic, and she instead visited with E.M. virtually and by phone. Despite not being in person, these visits raised concerns for the Agency. The caregiver reported that Mother would often "taunt" E.M. by saying she had toys and food waiting for E.M. at her house. Meanwhile, Mother was upset that E.M. referred to the caregiver as her "new mom" but was not corrected by the caregiver, and she accused the caregiver of purposefully hanging up the phone during her calls and blaming it on E.M.

The social worker and CASS case manager talked with Mother to help her understand some of E.M.'s behaviors from E.M.'s perspective and to encourage Mother to focus on having positive interactions with E.M. The social worker also explained to Mother that the Agency had instructed the caregiver to allow E.M. to end calls when she preferred due to her age. Less than a week later, however, another incident arose when E.M. hung up with Mother after speaking with Mother for about four minutes. Mother responded by calling back approximately 15 times. The caregiver told E.M. to answer and at least say goodnight, but instead, E.M. repeatedly answered to tell Mother, "I told you not to call back" and then hung up. Mother continued calling and began texting threatening messages to the caregiver.

By May 2020, Mother and E.M. had resumed in-person visits and continued their phone calls. Mother, however, would still "taunt" E.M. For example, during a video call, Mother showed E.M. the refrigerator and told E.M. that she could eat any food in there once she came home. E.M. responded to such interactions by hanging up or throwing the phone, and E.M.'s case manager reported the interactions were causing E.M. distress. When the case manager tried to discuss one of these incidents with E.M. in

therapy, she "shutdown" and used "controlling play themes," such as building a wall so that the case manager could not talk to her.

Over the following months, Mother's inappropriate interactions with E.M. continued. During another call, Mother told E.M., who was eating a banana split, that she was "eating junk that's junk and you're a mess." She then stated, "[P]lay with the kids cuz that's the last time they're going to see you." After E.M. said I love you and hung up, Mother texted, "[I] can't wait to get you from those people wittle you will never see them again."[6] Although Mother's subsequent call on another night was "normal," E.M. refused to call her the following night. The social worker again explained to Mother that it was not appropriate to talk about E.M. coming home or to taunt her by promising certain foods "when she comes home."

During a video visit in July 2020, the caregiver reported that Mother showed E.M. a stack of birthday gifts and that when E.M. attempted to end the visit, Mother told E.M. she would start opening the gifts without her. Likewise, the CASS case manager reported that Mother was still showing E.M. toys and food that she could not have during video visits and that E.M. responded by throwing the phone and hitting others. In the weeks following, E.M. had been "out of sorts" and would hang up the phone or refuse to talk to Mother during scheduled calls.

In September 2020, Mother had major surgery but continued her video calls with then five-year-old E.M. Despite E.M.'s young age, Mother insisted on talking about her surgery during the video calls, showed E.M. her surgical site, and tried to show E.M. her "blood bags." The social worker instructed Mother to avoid such topics going forward.

---

[6] Mother often uses the nickname of "Wittle" for E.M.

In mid-October 2020, the social worker met with E.M. about having visits with Father. At the end of the visit, E.M. stated, "I have one thing to say. I don't want to do visits with Daddy. . . . But I do want to do visits with Mommy. I need to stay with [the caregiver] to be safe."

Mother remained hospitalized for complications until mid-October 2020. Once she returned home to the room she was renting from her landlord and roommate, Mother disclosed to the Agency that she was taking antibiotics and "Oxy" for pain management. Mother's landlord made several reports to the Agency about Mother's use of OxyContin, including that another roommate observed Mother "nodding off" in the kitchen while standing up and without being aware of the roommate's presence.

During a phone call between Mother and the social worker less than a week later, the social worker expressed concern about Mother's slurred speech and that Mother had reportedly fallen asleep during her visit with E.M. Mother responded that her speech only sounded slurred because she had a dry mouth. The social worker instructed Mother not to take pain medication before visits and phone calls with E.M. and that, if she needed to do so, she should inform the social worker who would reschedule her visit to ensure that E.M. did not become worried or scared during visits.

At a subsequent supervised visit, Mother appeared coherent, played with E.M., and cooked dinner for her. A few days later, however, the caregiver reported that a video visit had started off well but ended after 15 minutes when Mother began slurring her speech. E.M. had expressed concern about what was wrong with Mother's eyes, and then Mother's line went silent.

At the six-month review hearing in December 2020, the Agency recommended that Mother continue services. The Agency noted Mother had

demonstrated motivation to participate in reunification services, had completed domestic violence groups, was participating in individual therapy, and had visited E.M. consistently despite the COVID-19 pandemic. Still, the Agency was concerned about expanding Mother's visitation to unsupervised because of Mother's prescription use and E.M.'s young age. The Agency noted that during supervised visitation, video visits, and phone calls, Mother had exhibited slurred speech, fallen asleep, and made odd statements, all of which appeared to worry E.M.

During another meeting with the social worker in mid-December 2020, E.M. stated, "But I don't want to live with Daddy. I do want to live with Mommy though." At a supervised visit with E.M. the next day, Mother remained in bed. When the social worker gave a 15-minute warning for the end of the visit, E.M. ran out of the room without her shoes or jacket.

In early January 2021, Mother began twice-a-week unsupervised visits with E.M. Mother attended the visits without using pain medication, but the Agency remained concerned about Mother's suspected use of pain medication during phone calls and when texting. After a few weeks of unsupervised visits, the caregiver reported that E.M. had been struggling lately at school and had not completed schoolwork or homework. E.M. continued having nightmares and acting out by biting classmates, picking fights, acting impulsively, destroying objects, and running off. She had also been having frequent soiling and wetting accidents since October or November 2020.

The next month, the juvenile court granted additional reunification services and ordered Mother to have short, structured, unsupervised visits with E.M. twice a week with at least one hour spent outside. The court further ordered that Mother should not take "any impairing prescription medications" before visits.

A social worker observed the end of a March 24, 2021 unsupervised visit at Mother's home and found E.M. on Mother's bed. E.M. said she played doctor and with make-up during the visit but did not play outside. When Mother asked E.M. for a hug and kiss at the end of the visit, E.M. said "No" and left. Mother told the Agency that E.M. was very excited to see her during these visits and "wouldn't stop hugging and kissing her." In contrast, a week later, the caregiver reported that she had "finally" convinced E.M. to call Mother for 10 minutes and that E.M. said, "I don't want to come home [the caregiver] is my mom."

E.M. also continued to act out. At the beginning of April 2021, the caregiver reported that during the prior week's visit, E.M. took off running from Mother and hid behind a car. E.M.'s behavior was "getting worse," and she refused to listen to anyone and acted impulsively by hitting other children. When the caregiver told E.M. that the social worker would be coming the next day, E.M. said it was the caregiver's job to tell the social worker that she did not want to go home. The caregiver advised E.M. to tell the social worker this information herself.

Mother requested placement of E.M., and the juvenile court held a contested 12-month review hearing in June 2021. In its corresponding May 2021 report, the Agency expressed concerns about Mother continuing to speak with E.M. about the dependency case, other inappropriate topics, and unknown future events. The Agency also noted concerns about Mother's pattern of inconsistent behaviors when engaging with the caregiver, her roommates, and the social worker. The juvenile court denied Mother's request for placement but granted the social worker discretion to allow overnight visits with Mother.

9

On June 5, 2021, E.M. had her first overnight visit with Mother. When the caregiver arrived to pick up E.M. the next day, E.M. appeared angry and ran to the caregiver's car without saying goodbye to Mother. E.M. told the caregiver that during the overnight, Mother's male friend came to the hotel room and shared a bed with Mother and E.M. while watching a movie, and she was not sure if he spent the night because she fell asleep. Although a social worker tried to discuss the visit with E.M., she refused.

When the Agency raised this report with Mother, she initially said that her male friend came to the hotel to help fix her flat tire but that he did not come into the hotel room, stay in the hotel, or participate in the visit. Later, Mother admitted her friend carried E.M. into the hotel room and sat on the bed. She additionally disclosed that E.M. had asked her why she was "shav[ing]" her private parts on the bed with a mirror. Mother said she realized she made a poor decision and would work on trying to see things from E.M.'s perspective.

Despite these concerns, E.M.'s overnight visits with Mother continued into the next month but seemed to improve. E.M. reported that during visits, she and Mother engaged in appropriate activities such as watching television, playing dress up, and going outside. At a July 2021 child family team meeting, the team concluded the visits were going well and that Mother and E.M. were bonding and communicating well. The Agency noted its plans to increase overnight visits to twice a week.

Later the same month, a social worker met with E.M. and asked how she felt about going home with Mother. E.M. responded that she felt "uncomfortable," but when asked to explain, she said, "I don't want to tell you" and refused to discuss the topic further. When the social worker ended the visit and said she would meet with E.M. at Mother's house for her next

10

visit, E.M. stated, "No!  You can only see me at [the caregiver's] house.  Not at [Mother's] house!"

A few weeks later in August 2021, one of E.M.'s service providers reported that E.M. identified Mother as a "trigger" for her and as someone she did not want to talk about.  The service provider was concerned about E.M.'s behaviors and statements when they discussed Mother.

Later the same month, E.M. told the caregiver she would no longer be telling her anything about her visits with Mother.  But as overnight visits continued, more reports indicated that Mother was coaching E.M. and discussing the case with her.  For example, in late September 2021, E.M. was "highly dysregulated" and crying at the end of a visit.  When the caregiver asked E.M. why she was crying, E.M. responded that she wanted "both" Mother and the caregiver and that Mother said E.M. was going home to Mother on the "tenth."  In October, E.M. told the caregiver, "My mom says don't tell [you] anything about visits.  And I'm not suppose[d] to say anything about you know who."  The caregiver asked if you-know-who was Mother's male friend, and E.M. said, "Yeah but don't say anything cuz I don't want my mom going to jail."

Meanwhile, Mother's sobriety program reported that she had multiple behavioral violations and ongoing difficulties with drug testing.  During one drug test, Mother claimed to be unable to perform a urinalysis but then later provided a diluted sample.  When the program tried to administer an oral swab drug test and asked Mother not to talk, Mother continued talking and chewed on the oral swab so that it was unreadable.  During another urinalysis drug test, Mother acted suspiciously while providing the sample.  As a result, the Agency voiced concerns to Mother about her commitment to her sobriety and discontinued her overnight visits with E.M.

11

From November 2021 to March 2022, Mother's visits with E.M. appeared to improve, and E.M. seemed to enjoy them. E.M. would often hug and kiss Mother goodbye at the end of visits but was not upset.

Sometimes, however, E.M. had stomach pain during visits. At a November 30, 2021 visit, Mother called the social worker stating that E.M. was unable to focus on the visit because of stomach pain, and was screaming and crying. Yet, within 10 minutes of the social worker's arrival and informing E.M. that the caregiver would arrive soon to pick her up, E.M. began jumping and running around the living room and denied still having a stomach ache. Mother later said E.M. was "playing [them]" and that her stomach ache "was just an act."

Mother's unusual behavior during visits with E.M. and during her interactions with the Agency and caregiver raised additional concerns for the Agency and appeared to negatively impact E.M. For example, during a visit in late January 2022, the social worker noticed that Mother was speaking rapidly with "wide eyes." Mother played with E.M. on the grass and rolled around, and E.M. shouted that she could see Mother's "bottom" because Mother was wearing a dress without underwear. Mother continued to spin and laugh, and the social worker suggested ending the visit. Although E.M. said she did not want to leave, she hugged Mother and left with the social worker without incident. That night, E.M. was awake with nightmares until the next morning. In light of Mother's concerning behaviors and continued coaching of E.M., the juvenile court reverted visits to supervised and admonished Mother that she should not coach E.M. during visits.

At the March 4, 2022 contested 18-month review hearing, the juvenile court terminated reunification services, scheduled a section 366.26 hearing,

and reduced Mother's supervised visits to once a week.[7]  In addition, the Agency modified Mother's contact with E.M. due to E.M.'s ongoing emotional dysregulation, classroom disruptions, and increased anxiety after in-person visits.  Specifically, the Agency instructed Mother to call E.M. only at scheduled times and to visit with E.M. only at the visitation center.

In May 2022, the social worker asked E.M. about living with her caregiver and foster brothers and sisters, and she responded, "Yes, it's fun." When asked where her home was, she pointed toward the mountain and said, "Over the hills at my mom's house."

At a supervised visit the same month, the social worker observed E.M.'s emotional dysregulation, shifting moods, and running away from Mother. The worker also noted a tender moment that E.M. enjoyed when Mother began dancing with E.M. and twirling her around.  During the visit, Mother again made inappropriate comments to E.M. about the case, including promising, "We will be together soon." and "We will be a family again."  At the end of the visit, when Mother buckled E.M. into her booster seat in the social worker's car, she whispered something into E.M.'s ear, and E.M. began crying.

As of June 2022, Mother continued to attend group and individual therapy and reported a year of sobriety.  She reported positive developments in her life, including that she would be pursuing her master's degree in education starting in August 2022, that she was eating healthy and exercising, and that she intended to become an entrepreneur.

---

[7]    Mother filed a writ petition challenging the juvenile court's March 4, 2022 findings and orders.  After her attorney filed a letter informing the court that no viable issues could be raised, we dismissed the petition.  (*In re E.M.* (Apr. 29, 2022, D080113).)

The Agency continued to observe Mother's visits throughout June 2022 and noted that Mother was very focused on E.M. and played with her. Yet, Mother still struggled to be sensitive to E.M.'s needs and wishes, often badgering E.M. to play when she said she was tired and pressuring E.M. to eat when she said she was not hungry. The social worker also noted that Mother should stop making E.M. feel badly and guilty about visits ending and that she should use consistent boundaries with E.M.'s behavior. During E.M.'s last June visit, E.M. did not want to hug Mother, would not talk to Mother, and wiped away her kisses. She later threw a tissue box and water bottle at Mother and tried to draw on Mother with a marker, and she barely said goodbye at the end of the visit.

### III.

### *The Combined Section 388 and Section 366.26 Hearing*

The Agency's July 5, 2022 section 366.26 report recommended termination of parental rights and a permanent plan of adoption for E.M. The Agency explained that the caregivers had provided stability and permanency to E.M. since her placement with them on January 30, 2020, and that she did well under their care. E.M. had also lived with the caregivers previously from March 2016 to August 2017 when she was only eight months old. E.M. shared that she liked living with her "adopted brothers and sisters" and living with the caregiver, who she called "mommy."

According to the caregiver, E.M. had frequent nightmares and trouble sleeping after in-person visits with Mother and continued to have accidents at bedtime. It often took several days for E.M. to stabilize from behavioral episodes at home and school.

In the Agency's assessment, the social worker opined that E.M.'s relationship with Mother was a "friendship" and that their bond lacked

14

strength. Mother was incapable of empathizing with E.M. and being sensitive to her needs. The social worker acknowledged that Mother had maintained consistent contact with E.M. over the past two years but opined that their interactions had a "negative impact" on E.M., as evidenced by her increased emotional dysregulation, anxiety, and aggressive behaviors.

In September 2022, Mother filed a section 388 petition asking the juvenile court to modify its prior March 4, 2022 order and place E.M. in Mother's custody with family maintenance services. In support of her petition, she argued that her sobriety and avoidance of domestic violence were sufficient "changed circumstances" and that her "strong bond" with E.M. showed the requested modification was in E.M.'s best interests. After hearing argument, the court found Mother carried her prima facie burden to warrant an evidentiary hearing on the petition, and set it for a combined hearing with the section 366.26 hearing on December 20, 2022.

In two December 2022 section 366.26 addendum reports, the Agency repeated its recommendation to terminate parental rights. The first report indicated that Mother continued attending her weekly visits with E.M. and that Mother always brought snacks and activities. But E.M. had become "increasingly resistant" to Mother's phone calls and visits. During one visit, E.M. refused to go into a room with Mother and instead backed away from Mother and the monitor. E.M. often had to be persuaded to attend visits with Mother and preferred to miss them. E.M. also often declined Mother's calls, and after which Mother would "excessively text and call," E.M would answer and scream, "No, I don't want to talk to you" and hang up. Mother had responded, "I can call anytime I want because I'm the mother!" and often dismissed E.M.'s emotional and mental health needs. During another incident, Mother asked the caregiver to put her call on speakerphone while

E.M. was taking a bath so that E.M. could not take the phone and hang up on her. The report also noted that, in August 2022, E.M. asked her teacher if she could use her caregiver's last name instead of Mother's and began submitting assignments using the caregiver's last name.

The Agency's second December 2022 report described a drawing E.M. made of her "forever home" with the home address of the caregiver. E.M. wrote in various family members and then wrote in Mother's first name underneath those family members, apparently excluded, and scribbled over it with an "X." E.M. told the social worker, "Oh no, she can't live here."

During visits, Mother continued to make inappropriate promises to E.M. about "com[ing] home soon" and told E.M. to "start packing." And as recently as two weeks before the section 366.26 hearing, Mother told E.M. she would be "homeschooled." E.M.'s teacher reported E.M. had told her classmates and teacher that she would be going to a new school, and during the same period, E.M. had been so dysregulated and distracted in the classroom that she was unable to concentrate and had stopped completing some of her assignments. When asked if she wanted to talk to Mother on the phone, E.M. sometimes yelled, "No!"

At the December 20, 2022 combined contested section 388 and section 366.26 hearing,[8] Mother testified about her sobriety efforts and visits with E.M. She admitted into evidence photographs taken of E.M. during visits and testified that she and E.M. had a "strong and powerful connection" and

---

[8] The juvenile court received into evidence Mother's section 388 motion and photographs, as well as reports dated April 5, 2021, February 3, 2022, March 4, 2022, July 5, 2022, August 23, 2022, September 19, 2022, October 27, 2022, December 1, 2022, and December 20, 2022. Mother objected to admission of the October 27, 2022 report, which the court ruled it would consider for the limited purpose of understanding the dynamic in Mother's home.

that E.M. did not want visits to end. She denied whispering into E.M.'s ear at visits and claimed it was untrue that E.M. had no longer wanted to visit or call her.

After hearing argument and considering the evidence, the juvenile court denied Mother's section 388 petition, finding that circumstances had not changed and regardless, it was not in E.M.'s best interests to be returned to Mother's care. The juvenile court next considered the section 366.26 portion of the hearing and found E.M. specifically adoptable and that the sibling exception to adoption did not apply. Turning to the beneficial parent-child relationship exception, the juvenile court found there was "regular visitation and contact" between Mother and E.M., a finding the parties did not dispute. As to the existence of a beneficial parent-child relationship, the court found a relationship existed but that Mother had not carried her burden of proving it was positive and beneficial to E.M. The court noted that E.M. had spent less than half of her life in the parents' custody and noted the extensive documentation from both the caregiver and visitation supervisors about the sometimes unhealthy and negative interactions between Mother and E.M. at visits. The court found these negative interactions deprived E.M. of stability.

The court next found that, even assuming a beneficial relationship existed between Mother and E.M., the benefits of adoption were clear and the need for permanency was "so strong" in comparison to a relatively weak relationship that the third element of the exception was not met. The court terminated parental rights and freed E.M. for adoption.

## DISCUSSION

"The sole purpose of the section 366.26 hearing is to select and implement a permanent plan for the child after reunification efforts have

17

failed." (*In re J.D.* (2021) 70 Cal.App.5th 833, 851–852.) At this hearing "the juvenile court has three options: (1) to terminate parental rights and order adoption as a long-term plan; (2) to appoint a legal guardian for the dependent child; or (3) to order the child be placed in long-term foster care." (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.) "Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 (*Jasmine D.*), disapproved on another ground by *In re Caden C.* (2021) 11 Cal.5th 614, 636, fn. 5 (*Caden C.*).)

If the juvenile court finds a child is adoptable, the parent bears the burden of proving that one of the exceptions to terminating parental rights exists. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343.) One such exception is the beneficial parent-child relationship. (§ 366.26, subd. (c)(1)(B)(i).) For this exception to apply, the parent must show by a preponderance of the evidence: (1) regular visitation and contact with the child; (2) a beneficial parent-child relationship; and (3) that terminating the relationship would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. (*Caden C., supra,* 11 Cal.5th at p. 636.) When the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the court should order adoption. (*Id.* at p. 634.)

We apply a hybrid standard of review on appeal. (*In re J.C.* (2014) 226 Cal.App.4th 503, 530–531.) We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the

child, as well as the existence of a beneficial parent-child relationship, for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.) As a reviewing court, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will uphold the juvenile court's determinations even where substantial evidence to the contrary also exists. (*Id.* at p. 640.) We review for abuse of discretion the juvenile court's finding that the termination of parental rights would not be detrimental to the child. (*Ibid.*; see also *Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351 [practical difference between pure substantial evidence standard of review and hybrid standard of review is insignificant].) A court abuses its discretion "by making an arbitrary, capricious, or patently absurd determination." (*Caden C.*, at p. 641.)

Here, the juvenile court found Mother failed to carry her burden of establishing the beneficial parent-child relationship exception to adoption, concluding that "none of the circumstances in section 366.26 [, subdivision](c)(1) . . . exists in this case that would make termination of parental rights detrimental to [E.M.]." Substantial evidence supports this determination, and we conclude the court did not abuse its discretion in terminating Mother's parental rights.

The first element required for the beneficial parent-child relationship exception to apply—regular visitation and contact—is "straightforward," and "[t]he question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632; § 366.26, subd. (c)(1)(B)(i).) The juvenile court found, and substantial evidence shows, that Mother had regular and consistent visits and contact

with E.M. throughout the dependency.[9]  (§ 366.26, subd. (c)(1)(B)(i); *Caden C.*, *supra*, 11 Cal.5th at p. 636.)  Even at the beginning of the COVID-19 pandemic, Mother maintained consistent visits and contact with E.M.

As to the second element—the existence of a beneficial parent-child relationship—the juvenile court must "consider the evidence showing whether the parent's actions or inactions 'continued or developed a *significant, positive, emotional attachment* from child to parent.' " (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230, italics added.)  Factors relevant to this determination include the age of the child, the amount of time the child spent in the parent's custody, the interaction between parent and child, and the child's needs. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  The court should also examine "how children feel about, interact with, look to, or talk about their parents." (*Ibid.*)

Here, the juvenile court acknowledged "there is a relationship" between Mother and E.M. but stopped short of finding the relationship was a significant, positive, emotional attachment as required for the exception to apply.  That finding, too, is supported by substantial evidence.  E.M., who was seven years old at the time of the section 366.26 hearing, had spent less than half of her life with Mother.  And although E.M. called Mother "mommy," often expressed love for her with hugs and kisses, and enjoyed many of their visits together, the record also shows that E.M. also rejected Mother.  E.M. sometimes ran from Mother at visits and refused to speak with her on the phone.  Indeed, in the months leading up to the section 366.26 hearing, visitation supervisors and monitors documented numerous instances

---

[9]    The parties do not dispute that Mother satisfied this first element.  Nor do they dispute on appeal the juvenile court's finding that E.M. was specifically adoptable.

20

during which E.M. resisted even seeing or speaking with Mother. E.M. would often need to be persuaded to attend visits with Mother, and in response to Mother's incessant calls and texts, E.M. would scream at Mother that she did not want to talk to her. During some of these more recent visits, E.M. threw things at Mother, hit Mother, backed away from Mother and refused to go into a room with her, wiped away Mother's kisses, and left visits "easily" and without saying goodbye.

Moreover, Mother repeatedly failed to respect E.M.'s emotional needs and boundaries during visits and calls. When E.M. declined Mother's calls, Mother would call and text excessively and say that she could call "anytime I want because I'm the mother!" Mother once asked the caregiver to put her call on speakerphone while E.M. was taking a bath so that E.M. could not take the phone and hang up. And despite repeated reprimanding by both the court and Agency, the record shows that Mother throughout the dependency continued coaching E.M. about how to describe their visits and activities; discussed the dependency case and made future statements about E.M. returning to Mother's home and never seeing her caregiver family again; baited E.M. with promises of gifts and food items when she "came home"; and disregarded E.M.'s feelings by forcing her to eat or play even when E.M. expressed that she was too full or too tired. At the conclusion of visits, E.M. usually left without distress and without expressing that she wanted the visit to continue.

The record also shows these interactions and visits with Mother were often harmful and distressing for E.M. E.M. sometimes complained of stomachaches during visits with Mother, and she experienced increased anxiety and emotional dysregulation before and after Mother's visits. As early as August 2021, E.M.'s service provider reported that E.M. had

21

identified Mother as a "trigger" for her and someone she did not want to talk about. Accordingly, substantial evidence supports the juvenile court's finding that E.M. and Mother lacked a beneficial parent-child relationship.

Mother views the record differently. She emphasizes E.M.'s statement from earlier in the dependency proceeding that she "d[oes] want to live with Mommy though" and also points to E.M.'s May 2022 statement that her home was located "[o]ver the hills at my mom's house." In doing so, however, Mother asks us to reweigh the evidence and substitute our decision for that of the juvenile court, which we may not do. (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) Rather, on appeal, we look for substantial evidence supporting the juvenile court's decision and uphold that decision even in the face of *contrary* evidence. (*Ibid.*) As discussed above, the record here contains substantial evidence supporting the juvenile court's finding that E.M. lacked the requisite significant, positive, emotional attachment to Mother.

Moreover, more recent evidence in the record shows E.M. no longer felt the way she did when she made the statements highlighted by Mother on appeal. For example, when asked to draw her "forever home" in December 2022, E.M. drew a house showing the same numerical address as her caregiver's home, wrote in various family members from the caregiver's home, and then wrote in Mother's first name scribbled over with an "X." E.M. also shared that she liked living with the caregiver, who she called "mommy." In August 2022, E.M. asked her teacher if she could use her caregiver's last name instead of Mother's, and began doing so on her schoolwork. Even earlier in the dependency, E.M. told Mother, "I don't want to come home, [caregiver] is my mom."

Mother also highlights notes in the record from various points in the dependency indicating that E.M. and Mother's visits were going "well" and

that E.M. enjoyed them. We acknowledge that E.M. and Mother sometimes had positive interactions and visits, but this evidence falls short, particularly when considered together with the substantial evidence discussed above, of establishing the significant, positive, and emotional attachment required for the beneficial parent-child relationship exception to apply.[10] (See, e.g., *In re Dakota H.* (2005) 132 Cal.App.4th 212, 229 [a parent must demonstrate something "more than frequent and loving contact, an emotional bond with the child, or pleasant visits"]; *In re Angel B.* (2002) 97 Cal.App.4th 454, 468 ["the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt"].)

Finally, even assuming there was a beneficial parent-child relationship between Mother and E.M., we nevertheless conclude the juvenile court did not abuse its discretion by finding the benefits of adoption outweighed any detriment caused by terminating Mother's parental rights. In assessing whether terminating the parental relationship would be detrimental to the child, "the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) This requires the juvenile court to determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the

---

[10] Mother's emphasis on a February 2022 visit note that E.M. "had a hard time leaving the visit" with Mother also does not warrant a different conclusion. The visit notes show that E.M. did not want to leave that particular visit because she wanted to finish playing a game, not because she was sad to leave Mother. The notes also state that, at the beginning of the visit, E.M. did not want Mother to join her game, and at the visit's conclusion, she began to hit Mother and "left the room and Mother easily."

child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.)

At the contested hearing, Mother's attorney presented little evidence that terminating E.M.'s relationship with Mother would be detrimental to E.M. Rather, the crux of her argument was that the Agency and caregivers had improperly influenced E.M. to change her "tone" and feelings toward Mother in the months leading up to the hearing. The juvenile court acknowledged this argument but found it implausible and lacking an evidentiary basis. Although Mother complains about the juvenile court's reading of the evidence in this manner, it was no abuse of discretion.[11] (*Caden C.*, *supra*, 11 Cal.5th at p. 640 [as a reviewing court, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' "].)

Further, the Agency offered substantial evidence that Mother's visits and calls *with* E.M. caused her distress, anxiety, and to act out. Indeed, as recently as two weeks before the hearing, Mother made promises to E.M. about "com[ing] home soon" and that she would be "homeschooled." During the same timeframe, E.M.'s teacher reported E.M. had told her classmates and teacher that she was going to a new school, and E.M. had been so dysregulated and distracted in the classroom that she appeared unable to concentrate and stopped completing some of her assignments. Thus, on this record, the juvenile court did not abuse its discretion in concluding the stability of an adoptive home outweighed any harm to E.M. from severing her

---

11    Mother also suggests that E.M.'s negative behavior was caused by feeling "torn between having two mothers" and that this conflict did not require one of those relationships to be severed. As the Agency responds, however, that is not the legal standard for the beneficial parent-child relationship exception to apply.

relationship with Mother.  (*Caden C.*, *supra*, 11 Cal.5th at p. 633 [court may consider whether severing relationship causes child to suffer "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression"].)

DISPOSITION

The juvenile court's December 20, 2022 order is affirmed.

DO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


BUCHANAN, J.